**UNITED STATES of America, Plaintiff,**

v.

**Abed WAZWAZ, Defendant.**

**Criminal No. 3–96–73.**

United States District Court,
D. Minnesota,
Third Division.

Jan. 27, 1997.

---

Andrew Stephen Dunne, United States Attorney's Office, Minneapolis, MN, for U.S.

Carl John Newquist, Newquist & Ekstrum, Minneapolis, MN, for Abed Wazwaz.

## STATEMENT OF REASONS FOR IMPOSING SENTENCE

DAVIS, District Judge.

### I. FINDINGS OF FACT

Pursuant to Federal Rule of Criminal Procedure 32(c), the probation office has conducted a presentence investigation (PSI) in this matter. *See also* 18 U.S.C. § 3552. Neither party raises any objections to the factual statements contained the PSI, therefore, the Court adopts those statements as its findings of fact.

As detailed in the PSI, Abed Wazwaz (defendant), owner of Adam's Dairy in St. Paul, Minnesota, was an authorized participant in the United States Department of Agriculture (USDA) Food and Nutrition Service's food stamp program. As a participating merchant, the defendant received food stamps, in lieu of cash, from qualified recipients purchasing groceries in his store. The defen-

---

dant was also authorized to accept food vouchers issued through WIC (Women, Infants, and Children)—a program which seeks to provide nutrient-rich foods to low-income pregnant women, infants, and children who suffer from diagnosed medical conditions or nutritional deficiencies. *See* attached letter from Mary Peick, dated October 29, 1996.

In March 1993, two Confidential Informants (CIs) provided information to law enforcement officers that they had regularly sold food stamps to the defendant at Adam's Dairy for half of their face value. One of the informants (CI) stated that s/he had sold food stamps to the defendant in amounts as high as $2,000 in a week. Between July and September of 1993, the CI sold the defendant a total of $800.00 worth of food stamp benefits in exchange for $400.00 cash.

Nearly two years later, law enforcement officers were still receiving information concerning alleged food stamp trafficking at Adam's Dairy. On June 28, 1995 a CI traded $299.68 in food stamp benefits for $150 in cash at the store. Two days later, the same informant received another $150 in exchange for $299.99 worth of benefits. Finally, on July 21, 1995 a CI sold $299.97 worth of food stamps to the defendant in exchange for $150 in cash. That same day, a search warrant was executed at Adam's Dairy. Records recovered from the search revealed a substantial number of highly suspicious transactions which indicated a pattern of long-term trafficking at the store.

The building in which Adam's Dairy was located was condemned on August 15, 1995, at which time the defendant was notified that he could no longer do business at that location. USDA records indicate that Adam's Dairy continued to redeem food stamp benefits after the date of condemnation.

## II. PURPOSES

On June 19, 1996 the defendant was indicted on four counts of Acquiring and Possessing Food Stamps in violation of 7 U.S.C. § 2024(b). The defendant pled guilty to Count 1 of the Indictment regarding the July 21, 1995 transaction. The plea agreement contemplated that the remaining three counts be dismissed at sentencing. The gov-

ernment so moved and the Court granted its motion.

The sentence imposed by the Court is intended to punish the defendant and deter him and other similarly situated individuals from committing future crimes of this nature.

## III. APPLICATION OF THE GUIDELINES

The Court adopts the following applicable guidelines calculations contained the PSI:

| | |
|---|---|
| Total Offense Level | 4 |
| Criminal History | 0 (Category I) |
| Imprisonment Range | 0—6 months |
| Supervised Release | 2—3 years |
| Fine Range | $250—$5,000 |
| Special Assessment | $50 |

For the reasons set forth below, the Court rejects the government's recommendation and denies defendant's motion for a strictly probationary sentence.

## IV. SENTENCE

The Court sentences the defendant to three (3) years probation under the following conditions:

1) The defendant shall be incarcerated for 6 months at the VOA or a similar facility that can accommodate the defendant's health condition.

2) The defendant shall not commit any crimes, federal, state, or local.

3) The defendant shall abide by the standard conditions of probation recommended by the Sentencing Guidelines.

4) The defendant shall not possess any firearms or other dangerous weapons.

5) The defendant shall pay restitution of $299.97 to the U.S. Department of Agriculture, Financial Management, Food and Nutrition, P.O. Box 953779, St. Louis, Missouri 63159–3779.

6) The defendant shall provide the probation officer access to any requested financial information.

7) The defendant shall not be required to undergo mandatory drug testing as set forth by 18 U.S.C. §§ 3563(a) and 3583(d).

8) The defendant shall pay a $5,000 fine.

9) The defendant shall immediately pay a $50 Special Assessment to the Crime Victims Fund.

10) The defendant shall surrender himself to the U.S. Marshal by 12 noon on Monday, February 24, 1996.

## V. STATEMENT OF REASONS

The defendant, by his counsel, has urged the Court to be as lenient as possible overall in sentencing and in any event to only impose a probationary sentence. Defendant asserted a number of "facts" during the sentencing hearing which he contends justify his request and establish three compelling reasons—fear, mercy, and charity—for leniency in this case.

First, the defendant asserted that the reason he engaged in illegal trafficking of food stamps in the first instance was because an unknown perpetrator threatened him at gunpoint to do so. Fear, he alleges, was the only reason he did what he did. Next, the defendant pled for mercy based on the "fact" that he and his family were victims too, in that they had fallen prey to seven armed robbers during their short tenure as neighborhood grocers. Finally, (and most incredulously) the defendant argued that his charity, namely the purported extension of nearly $60,000 in credit to his customers, is a "fact" which warrants due consideration in the Court's sentencing decision. In sum, the defense suggested that these "facts" taken altogether, in addition to defendant's health condition, paint a picture of an individual deserving of the Court's compassion. We obviously disagree as evidenced by our harsh sentence and, in fact, view the defendant in a light completely contradictory to that which the defense has encouraged us to embrace.

Overall, the Court is unmoved by the defendant's arguments and has afforded little or no weight to the seemingly bald assertions upon which those arguments rest. Even if the defendant's factual assertions were true, they still would not rise to the level of mitigating circumstances which would alter the Court's sentence in this case. Thus, rather than rely on undocumented and/or unpersuasive assertions, the Court looks to more compelling and, unfortunately, more disheartening evidence in the record to arrive at a sentence that approaches an accurate embodiment of this Court's perspective on the seriousness of defendant's conduct and resulting culpability. In particular, the Court relies upon evidence in the record detailing how the defendant's greed significantly impacted on low income and needy children in the St. Paul community. *See* attached letter of Mary Peick, dated October 29, 1996. Also of significance to the Court are reports made to the probation office by neighborhood residents and local agencies regarding the increase in drug trafficking and other deteriorating effects that defendant's food stamp trafficking had on the neighborhood surrounding his store.[1]

In a nutshell, defendant's conduct made it possible and easy for poor women, bound by drug and alcohol addiction, to support their addictions and deprive their children of basic needs and nutrition in the process. By allowing mothers to come to his store and trade food stamps and WIC vouchers for cigarettes, beer, or cash (which was quickly converted to drugs, sometimes right outside the store), the defendant caused innocent children to suffer. From this Court's perspective, the defendant is just as odious as the street-level drug dealer who is demonized by society for supplying the addicting poison in the first place. Both of them prey on poor, vulnerable, and desperate people for the sake of gaining a dollar. The only difference is that the contribution of individuals like the defendant to the tragic perpetuation of cycles of illegality, poverty, and violence in our neighborhoods (unlike the widely publicized impact of the drug dealer) often goes unrecognized. As a result, individuals like the defendant escape condemnation as we collectively ignore the cumulative impact that their greed and illegal conduct has on the increased hopelessness, fear, and despair in our inner city neighborhoods.

The Court does not indict the defendant for the choice that all too many mothers have made to smoke crack or drink alcohol, rather

---

1. Not surprisingly, the defendant does not live in the neighborhood that he helped to corrupt, but rather resides with his children in the suburb of Brooklyn Center.

than provide basic needs and nutrition for their children. That desperate decision is clearly beyond the defendant's control. However, the defendant is accountable for profiting on those vulnerable decision makers by providing a one stop shop for them to cash-in their only means of livelihood for their children and buy a five minute high on the way out door. It is that blameworthy conduct for which the Court sentences the defendant in this case.

## APPENDIX

October 29, 1996

The Honorable Michael J. Davis
U.S. District Judge
738 U.S. Courthouse
316 N. Robert Street
St. Paul, MN 55101

Dear Judge Davis,

I wish to comment on the Abed Wazwaz case. I realize that Mr. Wazwaz pled guilty to defrauding the Food Stamp program, but we know from law-enforcement and WIC participants that he also defrauded the WIC program. There were victims in this case: low-income babies and young children who participated in the WIC program, and since they are unable to speak for themselves, I wish to speak for them.

I coordinate the WIC program for Ramsey county. WIC (the Special Nutrition Program for *W*omen, *I*nfants, and *C*hildren) serves over 16,000 low-income pregnant women, babies and children each month. In order to participate in WIC, applicants are screened and must be found to have a medical or nutritional problem that WIC foods can help. The WIC foods are highly nutritious—rich in iron, calcium, Vitamin C, protein, and other nutrients essential for proper growth and development. When a child is enrolled in WIC, a WIC food package is prescribed for the child and the parent or guardian is counseled by our staff about how to most effectively use those WIC foods to improve the child's medical problem.

Our WIC babies and children here in Ramsey county are enrolled for a variety of problems—underweight, failure to thrive, inadequate diets, etc. Many of them suffer from iron-deficiency anemia, a condition which can affect their ability to learn. Additionally, iron-deficient children are at higher risk of undue-lead absorption which is an issue of great concern because there is so much older housing stock here in St. Paul in which lead-based paint was used.

When Abed Wazwaz took WIC vouchers which had been issued specifically to these children for nutrient-dense WIC foods and failed to give those WIC foods in return, those babies and children suffered. They did not receive the prescribed foods which would have helped improve their medical and/or nutritional problems.

The whole purpose of WIC is to develop healthy children who can reach their full potential and become productive citizens. I cannot tell you how frustrating and heart-breaking it is for us to identify a child who has health problems, provide WIC vouchers for nutritious foods, counsel the parents on how to use the WIC foods to ameliorate the child's problem, and then have it all rendered worthless when a bad vendor like Mr. Wazwaz gives cigarettes or beer or cash instead of the nutritious foods that child needs. These children are being robbed of their future so that Mr. Wazwaz can make an illegal profit.

Thank you for reading and reflecting on my comments. Please do not hesitate to call me if I can provide more information.

Sincerely,

/s/ Mary Peick

Mary Peick, M.P.H., R.D.
WIC Coordinator
St. Paul Public Health
292–7037

cc: Leslie Parsons